OPINION OF THE COURT
Evelyn Frazee, J.
Procedural Background
This matter is before the court on an order to show cause brought by plaintiffs State of New York and New York State Department of Environmental Conservation (State or DEC). The State alleges a public nuisance and seeks a preliminary injunction enjoining the defendants[1] from accepting, receiving or storing any additional asphalt, asphalt emulsion or other asphalt product or derivative at the Monoco Oil Company, Inc. *744 (Monoco) plant in Pittsford, New York, and compelling the defendants to expeditiously and lawfully remove asphalt, asphalt emulsion or other asphalt product or derivative presently at the plant within 30 days.
Defendants responded to the order to show cause by denying in all respects the State’s allegations in support of the application for preliminary injunctive relief and requesting the opportunity to continue to implement enhanced odor-controlled technology so that Monoco can continue to conduct its business.
By notice of cross motion, the Town of Pittsford (Town) moved to intervene as a party plaintiff in this proceeding.[2] In addition to the grounds asserted by the State, the Town also seeks a preliminary injunction on its independent claim of a violation of its zoning ordinances. At oral argument, the Town’s motion to intervene was granted pursuant to CPLR 1013. Decision was reserved as to the Town’s entitlement to a preliminary injunction as a matter of law based on a violation of the Town’s zoning ordinances.
The State’s and Town’s requests for preliminary injunctive relief based on a public nuisance were referred to a hearing. This decision addresses the issues raised on the Town’s order to show cause seeking a preliminary injunction as a matter of law based on violation of the Town’s zoning ordinances as well as the State’s and Town’s separate requests for a preliminary injunction based on a public nuisance.
Town’s Application for Preliminary Injunction
Both the State and the Town assert that odors emanating from the plant constitute a public nuisance as do the soil, groundwater and/or surface water contaminants emitted by the plant. The Town asserts as additional arguments in support of its request for a preliminary injunction that:
(1) conversion of the facility by Monoco in 1983 from a fuel oil storage and transfer terminal to an asphalt storage and transfer terminal violates the June 2, 1969 decision and June 10, 1969 judgment of the Honorable Marshall E. Livingston, J.S.C.;
*745 (2) such conversion violated and continues to violate the Town’s zoning ordinances.
Justice Livingston’s Decision
The issue presented in Justice Livingston’s 1969 decision in Monoco Oil Co. v Town of Pittsford (Sup Ct, Monroe County, June 2, 1969, Livingston, J., index No. 861/68) was the constitutionality of the Town’s zoning ordinance as applied to Monoco’s land. In 1953, the subject parcel was rezoned from Industrial to A-Residential, which was carried over into the then applicable ordinance adopted on April 8, 1963. The preexisting oil storage facility run by Monoco’s predecessor in interest, Tidewater Oil Company, continued operating as a nonconforming use. Shortly after acquiring the property in 1967, Monoco petitioned the Town of Pittsford Town Board (Town Board) to change the zoning for a portion of the premises from a residential district to a commercial district. The Town Board denied Monoco’s request for a variance. Monoco sought the zoning change in furtherance of its plan to expand the nonconforming use by constructing two tanks. As Justice Livingston noted, the variance changing the designation of the property was sought because Monoco feared that as a nonconforming use its operation could be discontinued by the adoption by the Town of an ordinance that amortized and terminated all nonconforming uses over a period of time. Justice Livingston held that the property could not be reasonably used as a residential property and that the value was significantly decreased by this designation. He found that the A-Residential classification of the property amounted to a confiscatory taking of Monoco’s property without due process. The court declared the “ordinance unconstitutional, invalid and confiscatory insofar as it classifies plaintiffs property ‘A-Residential’ ” (supra, slip opn, at 9).
Justice Livingston granted the requested variance and the property was subsequently zoned commercial. The relevant issue raised herein is whether use of the property for the storage and transfer of asphalt meets the criteria of the Town’s commercial zoning ordinance.
Compliance with the Town Zoning Ordinances
The applicable zoning ordinance for a commercial zone in 1969 until 1992, which encompasses the date of the conversion of the subject facility from a fuel oil to asphalt storage facility, was article VI, section 15-76. Subdivision (4) of that ordinance, in relevant part, provides that in commercial districts a premises can be used for: “Receiving, storing, repackaging and *746 selling at wholesale completely manufactured, assembled, processed and finished products which are not inherently dangerous, unreasonably odorous and are reasonably noninflammable, and the handling of which will not disseminate noise, smoke vapor or any substance detrimental to the health, well-being and general safety of the community” (emphasis added). The Town asserts that the conversion of the property from fuel oil storage and transfer to asphalt storage and transfer violated the commercial zoning ordinance in effect from 1969 until 1992 in three respects:
(1) Monoco was no longer selling at wholesale a completely manufactured, assembled, processed and finished product because the additional step of heating the asphalt material must be undertaken at the premises, which constitutes additional processing onsite;
(2) asphalt is unreasonably odorous; and
(3) the handling of the asphalt disseminates a substance which is detrimental to the health, well-being and general safety of the community.
The court rejects the first argument regarding the wholesale nature of Monoco’s operation. In order to be handled, the asphalt product must be heated. It comes to the plant in heated rail cars or tankers and is transferred to storage tanks where it continues to be heated. It is then transferred to the tanker truck for consumption in a heated state. The court does not find the heating of the asphalt to be processing, but merely a necessary condition for handling of the material. Further, a stipulated fact of the parties is that the fuel oil was also subject to a heating process.
As to the second and third arguments by the Town, Monoco contends that these provisions are vague and, therefore, void, citing Bakery Salvage Corp. v City of Buffalo (175 AD2d 608 [4th Dept 1991]). In Bakery Salvage (175 AD2d 608, supra), the ordinance at issue recognized that there is no reliable objective test for determining a noxious odor, yet went on to define a noxious or offensive odor to be “ ‘[t]he minimum concentration of odor required to give the first sensation of fetid or noisome odor to a person of average odor sensitivity’ ” (supra, at 609). The ordinance further provided that upon petition of at least 20% of the owners of real property within a one-quarter-mile radius of the point of the odor emission, the Common Council must conduct a hearing to decide whether to issue a regulated use permit to enable the establishment to continue its operation of business. The factors to be considered by the *747 Common Council in making its determination were “1) whether the ‘use complained of . . . predated the residential uses affected’, 2) ‘the economic impact on the establishment and the City and its citizens of denying the use or permit or approving it with conditions’ and 3) ‘[w]hether the residents’ loss of comfort can be compensated for with’ the cessation of the use” (Bakery Salvage Corp. v City of Buffalo, supra, at 609).
As noted by the Court, the void-for-vagueness doctrine requires that a statute or ordinance be “ ‘informative on its face’ ” (supra, at 609). In holding the ordinance unconstitutional, the Court noted that it lacked a reasonable degree of definiteness in various of its provisions and left “ ‘virtually unfettered discretion in the hands of the Common Council’ ” (supra, at 610).
The language of the Town of Pittsford ordinance arguably falls within the classification covered by Bakery Salvage (supra) in that there is no objective standard by which one can determine whether something is “unreasonably odorous.” However, when linked with the language in the ordinance prohibiting the emission of substances that are detrimental to the health, well-being and general safety of the community, the Town’s ordinance is distinguishable from the ordinance before the Court in Bakery Salvage because it sets a standard which is essentially the definition of public nuisance. Unlike the Buffalo ordinance in Bakery Salvage, which was concerned merely with economic impact and the residents’ loss of comfort, the Town of Pittsford ordinance addresses the concern for residents’ health, well-being and general safety. Thus, the defendants’ argument that the Town of Pittsford ordinance is unconstitutional due to vagueness is rejected.[3] The analysis to determine whether Monoco has violated the ordinance by emitting a substance that is detrimental to the health, well-being and general safety of residents is, in essence, whether Monoco is a public nuisance. This will be further discussed in that portion of this decision addressing the claims that Monoco, in its operation, constitutes a public nuisance.
*748 Public Nuisance Claims
On or about April 4, 1994, the Town, pursuant to the March 24, 1994 Memo of Understanding, established an Odor Hotline to record in a consistent and organized fashion the complaints of citizens and residents in the area of Monoco’s facility as to odor emissions from the plant. Witnesses testified that they first detected odors emanating from the plant in or about the mid-1980’s. These complaints led to the commencement of an action by the Town against Monoco in 1986. As noted previously, establishment of the Odor Hotline was one of the conditions for discontinuance of the Town’s lawsuit against Monoco. From April 4, 1994 to December 9, 1999, over 2,100 calls concerning 891 separate odor events have been recorded on the Odor Hotline. An examination of the Odor Hotline log indicates that a variety of individuals have called the Odor Hotline to complain and that the complaints are not limited to a few individuals who are campaigning to close the defendant facility as Monoco has asserted. Indeed, odor incidents are more likely to be underreported to the Odor Hotline because, as several persons testified, calls may not be made to report an incident due to time constraints or a feeling that calling would be futile and probably not effect any change. Further, presumably not all people in the area potentially affected by the fumes are aware of the existence of the Odor Hotline.
Defendants have pointed to the results of instrument testing of offsite air samples which showed no significant asphalt components in the atmosphere. The proof establishes that this testing is inconclusive and unreliable. The level of emissions varies and detection of odors and fumes is often dependent upon wind direction. Unless the equipment was set up at a time when there was a detectable level of emissions and in an area where the emission could be detected, i.e., within the plume of emission, the testing has questionable validity. Since the availability of the detection equipment is limited, the ability to obtain valid test results is problematic. Therefore, the observations of affected persons in the area are the most reliable sources of detection of odors and fumes emanating from the Monoco facility. The proof clearly established that defendants’ facility is the source of the odors.
As the log indicates, the odor from the plant, while intermittent, occurs fairly frequently and affects a number of residents and persons employed in the area of the facility. The observations noted on the Odor Hotline log, the affidavits and the in-court testimony establish that not only is the odor offensive, *749 but it also has an adverse effect on people’s health and their usual and necessary activities. The proof establishes that the fumes have caused numerous people to experience headache, light-headedness, nausea, sore throat, tearing and stinging eyes, coughing, reduced appetite, and fatigue, and has triggered asthma attacks. These reactions are consistent with the findings of a scientific study of workers exposed to asphalt products in their employment (Thomas B. Johnson, Ph D, Aug. 11, 1999 affidavit and testimony). The level of exposure of people in the area of the Monoco facility to asphalt fumes and their components cannot be definitively established. While some of the components of asphalt fumes may be carcinogenic, the proof fails to establish that the exposure of those in the vicinity of the Monoco facility has increased their risk for developing cancer.
The emissions have also prevented or impeded people in the area exposed to the fumes from being able to carry out their activities. This has included outdoor activities, such as children playing, walking, gardening, yard and lawn maintenance, and dining and entertaining. Indoor activities, such as work, school work, and sleeping, are also affected. The facility is bordered by an office complex and a high school. The effects of Monoco’s emissions have been especially troublesome and disruptive for the high school community. The school’s athletic fields are located next to the defendants’ facilities. Outdoor gym classes have ended early due to the adverse effects of the fumes. Scheduled gym class activities have been altered by the instructor in order to avoid the outdoors and the attendant exposure to the fumes. The fumes have affected people attending athletic events at the fields as well.
Classrooms, especially those on the side of the school closest to the plant, have been interrupted on numerous occasions by the noxious odors and often adverse health effects on students and faculty. The fumes permeate the building even when the windows are closed. In warm weather, the students and faculty face a dilemma. Other than a few administrative offices, there is no air conditioning in the building. If the windows are opened for ventilation, the presence of noxious fumes in the classroom frequently increases to an intolerable level. Yet, if the windows remain closed, the temperature and ventilation in the room are uncomfortable.
The Court of Appeals has defined a public nuisance as follows: “A public, or as sometimes termed a common, nuisance is an offense against the State and is subject to abatement or *750 prosecution on application of the proper governmental agency * * * It consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all * * * in a manner such as to offend public morals, interfere with use by the public or a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons.” (Copart Indus. v Consolidated Edison Co., 41 NY2d 564, 567, rearg denied 42 NY2d 1102 [1977].)
Clearly, the conduct of the defendants in allowing the continued emission of fumes from the Monoco facility has offended, interfered with and caused damage to the public in the exercise of rights common to all. The conduct of Monoco in this regard has interfered with the use by the public of the outdoors, school and work facilities, and their homes and has caused deleterious health effects and discomfort to a considerable number of persons. It has caused the public irreparable harm. The court finds that the emission of fumes by Monoco has created a public nuisance. It is also in violation of the Town of Pittsford zoning ordinances, as discussed above.
Remedy
Having found that the manner of operation of the Monoco facility constitutes a public nuisance and violates the Town zoning ordinances, the court must next consider the appropriate remedy under all of the circumstances presented. The State and Town urge the court to grant a preliminary injunction enjoining the defendants from further operations.[4] The defendants, on the other hand, have requested the court, in the event the operation is deemed to create a public nuisance, to grant them a further opportunity to institute remedial measures. Monoco now proposes to install a system comprised of both catalytic and oxidation components that is even more complicated and sophisticated than the previous systems. The maintenance and operation of the catalytic/oxidation (CATOX) system are correspondingly more technologically demanding than the prior systems instituted at the plant.
*751 In determining the remedy there is a distinction between a private nuisance and a public nuisance (see, Little Joseph Realty v Town of Babylon, 41 NY2d 738 [1977]; Boomer v Atlantic Cement Co., 26 NY2d 219 [1970]). While economic consequences between the effect of the injunction and the effect of the nuisance may be appropriately considered in a private nuisance action, they are not to be considered in a public nuisance action (see, Little Joseph Realty v Town of Babylon, supra; Boomer v Atlantic Cement Co., supra; Hoover v Durkee, 212 AD2d 839, 842-843 [3d Dept 1995]); In the context of a public nuisance lawsuit, the rule in New York is that the nuisance will be enjoined despite a marked disparity between the effect of the injunction and the effect of the nuisance (see, Little Joseph Realty v Town of Babylon, supra, at 743-745; Boomer v Atlantic Cement Co., supra, at 224).
The issue presented herein is whether the nuisance can be reliably and effectively abated by the defendants through the installation of the equipment which they now seek to employ or whether the grant of the preliminary injunction is the only effective remedy. To answer this question, consideration must be given to the defendants’ past conduct in complying with the applicable regulations and their representations and the efforts previously made to attempt to remedy the situation.
While the court is very mindful of the serious consequences and ramifications for defendants of the grant of a preliminary injunction, it cannot accept their representations that the proposed CATOX system will appreciably rectify the problem. Defendants have had 14 years of failed attempts to address the situation. Their efforts in this period cannot be characterized as being in good faith. Defendants have come into court and attempted to characterize the problem as the instigation of a few people who live in the vicinity of the plant. Defendants have denigrated the efforts of these people to seek a lawful and reasonable addressing and resolution of a situation which has had a very significant impact on their lives. Defendants’ approach in this lawsuit, and it appears throughout the last 14 years, has been to trivialize the legitimate complaints of their neighbors and to engage in only minimal efforts to resolve the problem. Under all the circumstances presented herein, the plaintiffs’ request for a preliminary injunction is granted. Monoco is restrained from accepting, receiving or storing any additional asphalt emulsion or other asphalt product or deriva *752 tive at its plant in Pittsford, New York. Upon further consultation with counsel, the court will address removal of asphalt material presently at the Monoco facility.
[Portions of opinion omitted for purposes of publication.]

. The individual defendants are officers and shareholders of the corporate defendant Monoco Oil Company, Inc.

. In 1986, the Town filed a lawsuit against Monoco alleging that odors from Monoco’s facility constituted a public nuisance. The Town’s complaint was subsequently amended in December 1992 to also allege zoning ordinance violations. This lawsuit was discontinued without prejudice in 1995, pursuant to a Memo of Understanding dated March 24, 1994. The Memo of Understanding was not reduced to a stipulation pursuant to CPLR 2104.

. The lapse of approximately 16 years since defendants converted the facility from fuel oil to asphalt storage and transfer does not estop the Town from now seeking to enforce its zoning ordinances. “Estoppel does not apply to preclude a municipality from enforcing the provisions of its zoning ordinance” (Matter of Ganco, Inc. v City Planning Bd., 244 AD2d 932, 934 [4th Dept 1997]). Further, the Town did seek enforcement when it commenced the 1986 action and subsequently amended the complaint in that action in 1992. The Town discontinued those proceedings without prejudice upon Monoco’s representation that it would undertake measures to ameliorate the situation.

. It should be noted that the usual three-prong test for injunctive relief, i.e., (1) a likelihood of success on the merits, (2) irreparable injury absent the granting of the preliminary injunction, and (3) a balancing of the equities favors the movant’s position, does not apply when the basis of the nuisance is a violátion of an ordinance, code or law (Town of Throop v Leema Gravel Beds, 249 AD2d 970 [4th Dept 1998]; City of New York v Bilynn Realty Corp., 118 AD2d 511 [1st Dept 1986]).